1

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                           MIAMI DIVISION
                    CASE NO.  21-CR-20242-CMA


UNITED STATES OF AMERICA,

                  Plaintiff,

       vs.

                                        Miami, Florida
                                        December 29, 2021
JOSEPH TIMOTHY GRENON,                  Pages 1-55

                  Defendant.
_____
```

```
                TRANSCRIPT OF FARETTA/PRO SE, ARRAIGNMENT
                        AND DETENTION HEARING
                BEFORE THE HONORABLE CHRIS M. MCALILEY
                    UNITED STATES MAGISTRATE JUDGE
```

**APPEARANCES:**

**FOR THE PLAINTIFF:**
                        *United States Attorney's Office*
                        BY:   JOHN C. SHIPLEY, JR., a.U.S.A.
                        99 Northeast Fourth Street
                        Miami,  Florida 33132


**FOR THE DEFENDANT:**

                        BY:   JOSEPH TIMOTHY GRENON, PRO SE




**TRANSCRIBED BY:**     DAWN M. SAVINO, R.P.R., C.R.R.
                        Official Federal Court Stenographer
                        400 N. Miami Avenue, 10S03
                        Miami, Florida  33128
                        Telephone:  305-523-5598

2

```
1                    P-R-O-C-E-E-D-I-N-G-S
2           THE COURT:  All right.  Let's go to Page 3, Joseph
3      Grenon, case number 21-20242.
4           Okay.  Mr. Grenon, good morning, sir.  Tell me your
5      name?
6           THE DEFENDANT:  Good morning.  I'm here by special
7      appearance.  My name is Joseph Timothy of the Grenon family.
8           THE COURT:  Okay.  Very good.  And you can pull that
9      microphone a little closer to you if you would, or maybe the
10     marshal could.  There.  Because I need to be able -- we record
11     everything so there is always a record.
12          THE DEFENDANT:  So it will be on court record,
13     everything?
14          THE COURT:  Everything.
15          THE DEFENDANT:  Okay.
16          THE COURT:  That's the way we do it.
17          THE DEFENDANT:  Thank you.
18          THE COURT:  We make a record of everything we do.  It's
19     available to the public.  So that's why I want you to speak up
20     into the microphone so that I can get a good record.  Okay?
21          THE DEFENDANT:  Okay.
22          THE COURT:  So we're scheduled here for a number of
23     hearings.  The first matter I want to address is I understand
24     you told Judge Torres, I think it was last week when you had
25     your first appearance, that you want to represent yourself.  Is
```

3

1   that still true?

2        THE DEFENDANT:  Correct.  Sui juris.

3        THE COURT:  Okay.  I don't know that sui juris applies

4   to that as all, just so you know.  You want to represent

5   yourself.  We call that pro se, being a pro se party.  Okay?

6        THE DEFENDANT:  Well, sui juris is of my own right and

7   it is accepted.  It's not pro se because I'm not asking to

8   represent myself, I'm telling you I'm going to defend myself as

9   sui juris.

10       THE COURT:  Okay.  I'm not going to debate that point

11  with you.

12       Okay.  So there's several hearings here today.  One is

13  I can have a hearing with you on that question of your

14  self-representation.  The other matters that are here are the

15  appointment of counsel for you, which really is in the same

16  decision, right, about whether you're going to represent

17  yourself or not.  You have been charged by an indictment, and so

18  we need to do an arraignment which is a very straightforward

19  proceeding that I'll explain to you in a bit.  And then you're

20  scheduled for detention hearing because the government has asked

21  that you be held without a bond.

22       So do you understand that's the three things we're

23  talking about here today.  One is whether you're representing

24  yourself or getting a lawyer; two, your arraignment, and three

25  the question of a bond or detention.

1          Do you understand those are the three things on our

2     agenda?

3          THE DEFENDANT:  That's what we'll be talking about,

4     yes.

5          THE COURT:  Yes.  Very good.

6          Counsel, let me have you enter your appearance please.

7          MR. SHIPLEY:  Good morning, Your Honor.  John Shipley

8     for the United States.

9          THE COURT:  Okay.  Welcome.

10          Okay.  Let's start with the question of your

11     self-representation.  All right?  Because everything else

12     follows from that.

13          So Mr. Grenon, why do you want to represent yourself?

14     In a few words, in a sentence or two, real simply.

15          THE DEFENDANT:  Because I feel I have the right to

16     represent myself, and I know exactly what my defense is going to

17     be.

18          THE COURT:  Okay.  All right.  So as you probably know,

19     under our -- I hope you know, and I'm going to make sure you

20     know, under our Constitution, the Sixth Amendment, et cetera,

21     one of our Bill of Rights, you have the right, the

22     Constitutional right, to be represented by an effective

23     attorney.  And you have -- if you cannot afford to hire an

24     attorney, you have the right for me to appoint a skilled

25     criminal defense lawyer to represent you at no cost to you.

```
 1              Do you understand that that is your Constitutional

 2    right?

 3              THE DEFENDANT:  Yes, I understand that is my

 4    Constitutional right.

 5              THE COURT:  Okay.

 6              THE DEFENDANT:  And I do have the right to defend

 7    myself and the due process of preparing my defense adequately

 8    also.

 9              THE COURT:  Okay.  If you would trust me that I will

10    walk us through every step of this, and just stay with my

11    questions right now, it would help us a lot and we'll get

12    through it a little bit more easily.

13              THE DEFENDANT:  Okay.

14              THE COURT:  Because my next step was to tell you that

15    if you knowingly, voluntarily and intelligently -- all of those

16    three things have legal meaning and my eye is on each one of

17    them -- if you knowingly, voluntarily and intelligently give up

18    that Sixth Amendment right I just told you about, you have the

19    right to represent yourself.

20              So now I've told you about two different rights.  Do

21    you understand what I've said?

22              THE DEFENDANT:  Uh-huh.

23              THE COURT:  Okay.  Let me start by asking you this,

24    sir, I know what you want, but work with me because I have to

25    work through several things here to get us to a conclusion.  Can
```

6

1    you afford to hire an attorney?

2            THE DEFENDANT:  No.

3            THE COURT:  Okay.  Now, what I would normally do is I'd

4    have you placed under oath and I would ask you some questions

5    about your finances, which is all of about typically three or

6    four questions I have.  It's usually enough.  And if I agreed

7    with you, which I've almost never disagreed with someone who

8    tells me they cannot afford a lawyer, then I would appoint a

9    private criminal defense lawyer to represent you.  So that would

10   be the normal process and what we would do here.

11           Do you understand that we could go ahead, I could ask

12   you those questions, and I could make a finding right now

13   whether you have the right to a free lawyer.  Do you want to go

14   ahead and just see and just be informed whether I agree that you

15   cannot afford a lawyer and whether you'd have the option to have

16   a free lawyer?

17           THE DEFENDANT:  No, thank you.

18           THE COURT:  Okay.  Now, I need to understand a little

19   bit more about you, sir, because I have to figure out if you can

20   knowingly, voluntarily and intelligently give up your right to

21   an attorney.  So I just want to ask you some questions, okay?

22           THE DEFENDANT:  Uh-huh.

23           THE COURT:  I read the Pretrial Services Report that

24   was prepared by our Probation Office.  A probation officer met

25   you, I think in the cell block when you were arrested, I think

1   it was last week, and asked you some questions and prepared a

2   report.  Do you remember that meeting?

3           THE DEFENDANT:  Yes.  Yes.

4           THE COURT:  Okay.  So I know a little bit about you

5   from that.  And I read that you have a high school -- your

6   education is a high school diploma, you have not furthered your

7   studies; is that correct?

8           THE DEFENDANT:  Correct.

9           THE COURT:  Okay.  So you have no -- am I correct that

10  you do not have any training in our legal system.

11          THE DEFENDANT:  Correct.

12          THE COURT:  Okay.  Have you ever served as your own

13  attorney before?

14          THE DEFENDANT:  This is my first problem, ever.

15          THE COURT:  Okay.

16          THE DEFENDANT:  My first legal problem.

17          THE COURT:  So then the answer is no, right?  Okay.

18          And let me ask Mr. Shipley, this is your case, sir,

19  right?

20          MR. SHIPLEY:  Yes, along with Mr. Homer.  Correct, Your

21  Honor.

22          THE COURT:  Okay.  Would you please just tell

23  Mr. Grenon -- am I saying your name right?

24          THE DEFENDANT:  Grenon.

25          THE COURT:  Grenon.  Tell Mr. Grenon what the charges

1   are against him.  I have the indictment and I see that there are

2   three charges, but would you state what the violation of the law

3   is that the government has accused Mr. Grenon of, and if you

4   could just, in the briefest way, a statement of facts just in a

5   brief summary of what the government has accused Mr. Grenon of.

6   I want to be sure he understands it, and then I want to review

7   what the maximum penalties are that the law provides for each

8   crime.

9           MR. SHIPLEY:  Certainly.  Certainly, Your Honor.

10          THE COURT:  Okay.

11          MR. SHIPLEY:  Briefly, the charges relate --

12          THE COURT:  Get closer to the microphone, please.

13          MR. SHIPLEY:  Okay, yes.  Would you prefer I speak with

14  the mask?

15          THE COURT:  I would.  I would, because that's where we

16  are today.  But you can pull that microphone down on the desk I

17  think, or you can sit.

18          MR. SHIPLEY:  Let's try this, and I'll make sure I

19  speak more loudly.

20          Your Honor, this Defendant, along with co-defendants,

21  also members of his family, are charged with serious offenses

22  that relate to producing, distributing and marketing a substance

23  that is an unauthorized, improper new drug, specifically

24  chlorine dioxide, which the defendants have, for a number of

25  years, produced and marketed as a cure for a variety of diseases

1    and conditions including the coronavirus, among others.

2            THE COURT:  The accusation is they've had kind of a

3    business, the family, producing this product and marketing it?

4            MR. SHIPLEY:  That is correct.

5            THE COURT:  Okay.

6            MR. SHIPLEY:  The indictment contains three charges.

7            THE COURT:  Okay.

8            MR. SHIPLEY:  Count 1 of the indictment is an

9    allegation of conspiracy to commit an offense against the United

10   States, or offenses against the United States, and also to

11   interfere with the lawful functions of the United States.

12   Basically that means that the defendants conspired to violate

13   laws against the marketing and production and distribution of an

14   unapproved new drug, and an unsafe drug, and that's specifically

15   the solution that they produce called MMS, Miracle Mineral

16   Solution.  That's what Count 1 relates to.

17           There are three objects of that conspiracy legally, but

18   it's conspiracy to violate the laws of the United States.

19           THE COURT:  Okay.  So conspiracy, Mr. Grenon is, under

20   our laws, if two or more people enter into an agreement to do

21   something unlawful, and they take some steps to further that

22   agreement, even if they don't accomplish the ultimate objective.

23           THE DEFENDANT:  I know the definition.

24           THE COURT:  And I'm stating this very broadly, and kind

25   of colloquially for you.  That's a kind of conspiracy.  Do you

1  understand that concept?

2          THE DEFENDANT:  I understand what the definition is,

3  and if I may, the false accusations that are being brought upon

4  us are very incorrect, because we have the First Amendment right

5  to this as our church is our sacraments.  These do not fall

6  under the codes of the United States, so we don't need approval

7  to have a belief, a religious belief.  And they say we're a

8  nonreligious church, but religion is a belief in a God, and we

9  are definitely Bible-believing Christians, and we have certain

10  sacraments that we believe cleanse our temple, and we have been

11  doing this for many years around the world helping many people,

12  and we do not sell anything under commercial law.  Everything is

13  donations that we have taken.

14          THE COURT:  Okay.  So let me stop you.  So what I'm

15  hearing you say, and I'm reframing this as lawyers do, because

16  the temple you're in now is a legal one.  That's the only rules

17  -- these are the only rules that apply, the rules of evidence,

18  the law.

19          So what I'm hearing you say is your defense is that

20  under your First Amendment rights of the Constitution, you are

21  somehow exempt from the law that the government says you are

22  conspiring to violate.  Did I sum it up well for you?

23          THE DEFENDANT:  No.  They are accusing us of something,

24  and as I was saying, if I have a religious belief and I am not

25  committing any harm to anybody, there are no victims, there's no

1    intent to do any harm, so if we're doing this and we've been

2    teaching people how to take care of their body, how to heal

3    themselves, how to restore their health, for teaching them how

4    to do this, and people voluntarily come to us and ask if they

5    can use our sacraments of the church, it's the Genesis II Church

6    of Health and Healing, if they come to us, then we do not deny

7    them because they need our help.  And we have years and years of

8    proof that has been wiped out by the US Government.  And also

9    You Tube, Facebook, Twitter, all those social medias have

10   eliminated our accounts with all the proof, testimonies,

11   affidavits, sworn affidavits we've had.  We have all this proof.

12            THE COURT:  Okay.  So you're getting into what --

13   you're getting into a lot of detail now that's going beyond what

14   we need to do today.  What I'm hearing here, and I'll come back

15   to it, is you have a series of arguments that you perceive as a

16   defense?

17            THE DEFENDANT:  Yes, ma'am.

18            THE COURT:  And I'm hearing them.

19            THE DEFENDANT:  Yes, ma'am.

20            THE COURT:  Okay.  So Mr. Shipley, the unlawful

21   agreement that's charged is to violate these, can I call them

22   FDA laws?

23            MR. SHIPLEY:  For present purposes, sure Judge.

24            THE COURT:  Yeah.  And the FDA laws prohibit, in the

25   government's view, the marketing and selling of the product with

1    the representations that were made about its use.  Is that

2    close?

3            MR. SHIPLEY:  Sure.  For present purposes, yes, Your

4    Honor.

5            THE COURT:  Right.  We're simplifying things here quite

6    a bit.

7            MR. SHIPLEY:  Understood.

8            THE COURT:  Okay.  So that's the conspiracy charge.

9    And the penalty for that?

10           MR. SHIPLEY:  It's a maximum of five years

11   imprisonment.

12           THE COURT:  Five years in prison.  So Judge Altonaga,

13   who I know is your presiding judge in your case, if you were

14   found guilty, she would have the legal authority to sentence you

15   up to five years in prison for the first count of conspiracy.

16   Do you understand that, Mr. Grenon?  For this to be a knowing

17   waiver, you've got to know and understand the consequences of

18   your possible conviction.  Do you understand what I've just

19   said?

20           THE DEFENDANT:  Yes, I know the consequences.

21           THE COURT:  Okay.  Very good.

22           Okay.  Mr. Shipley, I apologize for the interruption.

23   Tell us about Counts 2 and 3.

24           MR. SHIPLEY:  Sure.  Your Honor, that is the only count

25   against this Defendant.

1           THE COURT:  Okay.

2           MR. SHIPLEY:  This Defendant was residing in Colombia.

3    The other defendants or two of the defendants, co-defendants in

4    the case, were arrested in 2020.  Those are the defendants that

5    have already been found appropriate to proceed pro se and have

6    appeared in front of Judge Altonaga.  They are charged

7    additionally along with all the defendants in the indictment

8    with contempt, various contempt violations relating basically to

9    the fact the defendants continued to produce and market this

10   product, even after Judge Williams issued a series of orders in

11   civil litigation prohibiting it.  The terms of the extradition

12   do not include -- for this Defendant do not include the charges

13   of contempt.  There's no counterpart, as I understand it.  So

14   this Defendant will be tried here unless circumstances change

15   only on the conspiracy count in Count 1.

16           THE COURT:  I see.  I see.  So although Mr. Joseph

17   Grenon is in the indictment charged in Counts 2 and 3, pursuant

18   to the extradition, he was extradited to face charges only on

19   Count 1.

20           MR. SHIPLEY:  That's correct.

21           THE COURT:  Okay.  All right.  So that's very useful to

22   know.  So while your name is in the indictment for Counts 2 and

23   3, you are here to stand trial, should you choose to go to

24   trial, on Count 1, that conspiracy count.  Do you understand

25   that?

1        THE DEFENDANT:  Yes, ma'am.

2        THE COURT:  Okay.  Okay.  Now, I want to, while we're

3   talking about penalties, I want you -- I want to talk to you

4   briefly about the sentencing guidelines.  We're really jumping

5   ahead to the possible outcome if you're convicted and when Judge

6   Altonaga has to sentence you.  I realize a lot happens between

7   today and then, but this is a very important consequence so I

8   need to talk about it with you.

9        If you are found guilty, if you choose to go to trial

10  and you're found guilty, at the time of your sentencing the

11  Court is mandated by Congress to use, to apply, the sentencing

12  guidelines to calculate a proposed sentence.  This book is

13  about, I'm using my fingers to show you, at least an inch thick.

14  It's frankly rather complex.  But the Court's Probation Office

15  and then the Court and the lawyers in the case would take the

16  guidelines and calculate it to come up with ideally an agreement

17  on what the sentencing guidelines call for as a proposed

18  sentence.

19        Now, a Defendant might disagree with how the government

20  calculates the sentencing guidelines.  Might disagree with how

21  the court or the probation officer does that calculation.

22  Frankly, at this point, it would take me a lot of work, I don't

23  work with the sentencing guidelines now.  With all my years of

24  training, it's not the easiest thing.

25        So if you're going to represent yourself and if you get

1    convicted, this is hugely consequential how the guidelines get

2    calculated, and you would be on your own.  You don't get anybody

3    to help you with that, and that's just one of the things that in

4    representing yourself you have no assistance with.  Do you

5    understand that that would be a process that would happen and be

6    up to you to read the book and figure it out.

7            THE DEFENDANT:  I would figure it out, ma'am.

8            THE COURT:  Okay.  Okay.  Now, have you ever read the

9    rules of evidence?  The Federal Rules of Evidence?

10            THE DEFENDANT:  No.

11            THE COURT:  Have you ever read the Federal Rules of

12    Criminal Procedure?

13            THE DEFENDANT:  No, ma'am.

14            THE COURT:  Have you ever read the local rules of this

15    court?

16            THE DEFENDANT:  I have not had the ability.

17            THE COURT:  Okay.  They're all quite lengthy and they

18    all, by law, Judge Altonaga in handling your case, will have to

19    apply them.  And there can often be some rather protracted, and

20    sometimes esoteric, arguments that a defendant and the

21    government might get into with a trial judge about how those

22    rules apply to a particular case.  There are -- the Supreme

23    Court and other courts have written long opinions about it.

24    Sometimes it's straightforward.  So if you were to represent

25    yourself and go to trial, anything you would want to put before

1   that jury would have to pass through or be subject to the rules

2   of evidence, and you would have to figure that out on your own

3   if you don't have an attorney.

4           Do you understand that that would be a requirement for

5   any argument or evidence you want to put before the court?

6   Mr. Grenon, I'm asking about the rules of evidence.

7           THE DEFENDANT:  Yes, and I'm going to answer you that

8   the rights of a sui juris defendant are to be construed

9   liberally and to be less stringent in formal pleadings than

10  lawyers, because we did not go to school to learn the processes

11  and yet we still have the right to defend ourselves.

12          THE COURT:  Okay.

13          THE DEFENDANT:  They're held less stringent.

14          THE COURT:  I'm a little concerned about what you might

15  be thinking about that.  The rules of evidence will not be

16  loosened for you.  They will not.

17          THE DEFENDANT:  I'm talking about the procedure.

18          THE COURT:  Okay.  If you write something very

19  inartfully, Judge Altonaga will try to give you the benefit of

20  the doubt to understand what you're saying, recognizing you're

21  not a lawyer.  That's true.  But when I'm talking to you now

22  about the rules of evidence, they don't get relaxed for somebody

23  who chooses to not take advantage of a lawyer.  They still

24  govern.

25          THE DEFENDANT:  I know, and we have evidence.

```
1        THE COURT:  Okay.  I know you have evidence, but you
2   probably want a jury to hear it.
3        THE DEFENDANT:  Yeah.
4        THE COURT:  So you're going to want to make sure that
5   you can persuade the court that the rules of evidence allow a
6   jury to hear it, and she will interpret -- Judge Altonaga will
7   interpret the rules of evidence straight down the line as best
8   she can, but she's not going to relax those rules for you.  Do
9   you understand that?
10        THE DEFENDANT:  Yes.
11        THE COURT:  Okay.  The same is true for the Rules of
12   Criminal Procedure.  They're all sets of rules about how a
13   criminal case proceeds through what we call the discovery
14   process, which is where you and the government exchange
15   information leading up to trial.  If you choose to plead guilty,
16   there are rules of procedure around that.  If you chose to go to
17   trial, there are rules of procedure around that.  And even
18   sentencing.  All those rules would apply to you, as will the
19   local rules of this court.  And do you understand that if you
20   choose to not have a lawyer, that's not going to give you a
21   ticket out of enforcement of the rules of criminal procedure.
22   They'll be applied.
23        THE DEFENDANT:  Yes, and I do believe that I do have
24   the due process to be able to prepare my defense whether it's
25   learning those things, building my evidence up and creating my
```

```
1    case against the --
2            THE COURT:  Oh sure.  You'll have time to prepare.  But
3    --
4            THE DEFENDANT:  Well, I won't be able to prepare if I'm
5    locked in a cell for 24 hours a day.
6            THE COURT:  Well, you can prepare.  There are plenty of
7    people who are in jail who prepare.  It sure helps them a lot to
8    have a lawyer.  Sure does.  But that's a separate question,
9    whether you get out on a bond or not.  So I'm not there yet.
10   Whether you represent -- if you choose to represent yourself,
11   it's whether you're in custody or not.  So that's -- this is a
12   separate decision.  And yes, if you are in jail pending trial,
13   you'll have access to legal resources, but it's not going to be
14   as easy as if you're out at liberty, but it would be
15   Constitutionally adequate.  If you have a lawyer, they're doing
16   a lot of work for you in their office.
17           So I'm going back to the Rules of Criminal Procedure.
18   Do you understand that you're going to want to start reading
19   them and studying them.  Most people go to law school for
20   several years to get some master at this, but those rules would
21   apply to your case.  Do you understand that.  I need a yes or
22   no, it's the only way I can get a record here.
23           THE DEFENDANT:  Yes, ma'am.
24           THE COURT:  Okay.  Okay.  Let me ask you this:  As I
25   mentioned, the three criteria for you to establish your right to
```

1    represent yourself include that you are acting voluntarily, and

2    I mention that so you understand why I'm going to ask you these

3    questions.  I'm going to start with your family.  I gather your

4    father of course is the patriarch of your family, he's been

5    charged in this case.  Am I correct that he's in custody in

6    Colombia?

7              THE DEFENDANT:  Yes, ma'am.

8              THE COURT:  That's what I thought.  Okay.  So I'm

9    guessing that he'll be here at some point, that's a guess.

10   Probably a good guess.

11             THE DEFENDANT:  Uh-huh.

12             THE COURT:  And your two brothers have already been

13   arrested and are in custody.

14             Has your father, your brothers, family, friends,

15   followers of your church, anybody said anything to you to

16   pressure you, to convince you, maybe promised you something to

17   persuade you to ask this court to represent yourself?

18             THE DEFENDANT:  No, ma'am.

19             THE COURT:  Okay.  So there isn't anybody here that

20   you're trying to please; am I right?  Or you're trying to stay

21   safe from when you ask this court to represent yourself?

22             THE DEFENDANT:  Correct.

23             THE COURT:  Okay.  Is it -- and I've gone through a

24   number of things with you now, is it fair to say, sir, that this

25   decision you're asking -- that you want to make to represent

1    yourself, is a voluntary one?

2            THE DEFENDANT:  Yes, ma'am.

3            THE COURT:  Okay.  Okay.  So I heard you say, and I

4    don't want to get into the weeds on this now because this is not

5    the time.  I'm not your trial judge, that's Judge Altonaga.  I

6    have a very limited job to do here today.  Important, but pretty

7    limited.  I hear you raising a First Amendment argument against

8    the government's prosecution of you; I hear you making an

9    argument that you had no intent to harm and therefore you're not

10   liable; I hear you making an argument that nobody was hurt,

11   there are no victims, and that your customers voluntarily came

12   and bought this product, and somehow their action being

13   voluntarily somehow relieves you of any criminal responsibility

14   under the laws.  I just took notes on what you were saying.

15           THE DEFENDANT:  Yes.

16           THE COURT:  All of those -- I'm not saying it would be

17   a successful defense, but all of those are arguments I hear that

18   someone in your shoes would normally sit down with a lawyer and

19   say is a lack of intent to harm a defense?  Probably a pretty

20   clear answer on that.  Is the absence of actual harm a legal

21   defense?  A lawyer could pull up all the law on that for you.

22   Is the First Amendment -- is there any First Amendment defense

23   that can be made to these charges?  A lawyer could easily pull

24   up a lot of scholarship on that.  If I can show that customers

25   voluntarily came, and that was your word, voluntarily, is that a

 1    defense.  Those are all really good things to talk about with a
 2    lawyer who could help you a lot.  And I think they're pretty
 3    smart questions to ask for someone in your shoes.
 4              And I'm just speaking to you quite frankly as one human
 5    being to another, we're in a system that I care a lot about.  I
 6    care about you having a fair trial, and I'm just going to be
 7    honest with you.  I've done this job for a long time.  Before
 8    that I was a prosecutor and I was a defense lawyer.  I have
 9    enormous respect for both jobs.  I hold a special place in my
10    heart for defense lawyers.  I came to learn that their job is to
11    hold the government to the truth and to the law, and our system
12    is built that way.  And that's what defense lawyers do.  They
13    protect our Constitution and they protect people in your shoes.
14    I have never seen a defendant represent himself or herself and
15    get a good outcome, ever.
16              And frankly, you're giving the government a huge
17    advantage.  And I'm just being honest with you, having read a
18    little bit about the allegations in the complaint and listening
19    to you today, would it be fair to say that you hold some
20    opinions, and I don't want to get into them today because it
21    won't be productive, but you hold some opinions that are highly
22    critical of the government.
23              THE DEFENDANT:  Yeah, you could say so.
24              THE COURT:  Yeah, I thought so.  Okay.  You're not the
25    only one.  With that being said, why would you give them an

1    advantage?

2         THE DEFENDANT:  Well, I have God on my side.  I haven't

3    done anything wrong, and I'm willing to stand up for the truth

4    and I'm going to do it.  And I know, I know we're going to get

5    through this, so I'm not worried.  And I know -- I know my

6    family will do the same.

7         THE COURT:  You have a wife and small children in

8    Colombia is what I read.  Am I right?

9         THE DEFENDANT:  Yes, ma'am.

10        THE COURT:  I assume you want to get home to them?

11        THE DEFENDANT:  Yes.

12        THE COURT:  And you have expressed what I interpret as

13   a belief that the government has wrongly accused you?

14        THE DEFENDANT:  Uh-huh.

15        THE COURT:  That they've got the law wrong or they've

16   got the facts wrong.  That could happen.  Government lawyers,

17   like defense lawyers and like judges, they're just human beings.

18   We try to do our job, but we all make mistakes.

19        THE DEFENDANT:  Uh-huh.

20        THE COURT:  And I just urge you, as someone that's

21   spent a long time in this system, that if you believe that, take

22   advantage of every resource that's given to you.  My goodness, I

23   assume you paid taxes when you lived here, all of us do.  They

24   pay for free lawyers.  They're good.  They're really good.  If

25   you really believe you're wrongfully accused -- this is a

1   rhetorical question, I think I've already asked it but I have to

2   say it out loud -- why wouldn't you take advantage of every

3   resource to defend yourself and hopefully, for you, what you

4   want is to get you back home to your family sooner.

5          THE DEFENDANT:  Thank you, ma'am, for thinking that

6   way, but I'll get through this.

7          THE COURT:  Okey-doke.  Okay.  Well, all right.

8          So we talked about -- quite a bit, I can see that you

9   are -- you seem to have a clear mind.  You are very responsive

10  with me.

11         THE DEFENDANT:  Uh-huh.

12         THE COURT:  Some people you have a conversation with

13  and they're responding in things that don't, you know, make any

14  sense.  But we're tracking each other.

15         THE DEFENDANT:  Yep.

16         THE COURT:  I think you understand everything I'm

17  saying.  I think you've heard me urge you to not do this,

18  because I think it's an invitation, frankly, for you to be

19  convicted.  And that's without knowing the evidence in the case,

20  but just knowing the government's got really good lawyers, and

21  they have a lot of resources, and they took their time and got

22  their ducks in a row to bring charges against you.  They're

23  prepared.  You're not.  You don't have a lawyer, you don't know

24  anything about the law quite; respectfully, you don't, and

25  you've heard me tell you this straight out.  I've been as honest

1  as I can with you and nevertheless am I right, your wish is

2  what?  To represent yourself or to have me appoint a lawyer for

3  you?

4      THE DEFENDANT:  To represent myself, ma'am.

5      THE COURT:  Okay.  Okay.  Well, I find that you have

6  knowingly, voluntarily and intelligently waived your right to

7  counsel.  I'm going to leave this to Judge Altonaga whether she

8  appoints stand-by counsel for you.  That's happened with your

9  two brothers, but she's the presiding judge and you can address

10  that with her when you're before her.

11      THE DEFENDANT:  Okay.  May I say something please?

12      THE COURT:  Yes.  Uh-huh?

13      THE DEFENDANT:  Also on the court record on the docket

14  system, there has been a few lies placed in there that my

15  brothers completely denied assisting counsel and it says that

16  they requested it.  And it was not requested by my brothers.

17      THE COURT:  I read the docket.  I didn't see that.  I

18  read it last night when I found out --

19      THE DEFENDANT:  It says it in there.  It says right

20  after they were assigned, it says they requested, as requested

21  by defendant.

22      THE COURT:  Okay.  Well sir, people here are not lying

23  in the court system.  We're really not.  This doesn't work if we

24  lie.  I didn't see that.  If somebody said that about your

25  brothers, that's between them and the court, it's not between

1    you and the court.  And I'm just going to tell you here that I

2    think I've been straight with you, I hope you know it, I've been

3    very frank with you and we don't lie.  Do we make some mistakes

4    once in a while?  Sure.  We're human.  But we're not here to

5    lie, we're here to try to uphold the law.  We care a lot about

6    that.

7           Okay.  So you're representing yourself.  Let's talk

8    about your arraignment and then we'll talk about the question of

9    bond or detention.  So have you seen the indictment, sir?

10           THE DEFENDANT:  I have never been given an indictment.

11           THE COURT:  Okay.  Let's get you a copy of it right

12    now.  While we're printing it, what you've already heard is that

13    there are three charges in it.  And while your name appears in

14    all three, because of the conditions of your extradition, you

15    are, in fact, only proceeding to trial on Count 1, the

16    conspiracy count.  You do understand that, right?

17           THE DEFENDANT:  Yes, I do.

18           THE COURT:  Okay.  It's to your advantage.  And you've

19    heard Mr. Shipley summarize, and me too, what that conspiracy

20    charge is, correct?

21           THE DEFENDANT:  Uh-huh.

22           THE COURT:  So what I need to do is ask you in an

23    arraignment is how do you plead to that charge, are you pleading

24    guilty or not guilty?

25           THE DEFENDANT:  I will not plea anything.  I will

1    declare my innocence, ma'am.

2        THE COURT:  Okay.  Well, declaring your innocence is

3    the same thing in my book as a not-guilty plea.  So I am

4    entering a plea of not guilty on your behalf, to make it crystal

5    clear, because you told me you think you're innocent.  And I'm

6    going to issue the standing discovery order for you today which

7    starts the ball rolling on the discovery process.  It sets a

8    clock for the government to provide certain information to you

9    that they have about you that they would rely upon in their

10   prosecution of you.  It also places obligations on you to

11   provide information to the government.  So you're going to get

12   that standing discovery order, and you're going to need to read

13   it and make sure you uphold your end of the bargain.  Okay.  So

14   that takes care of arraignment.

15       Mr. Shipley, am I correct that the government is asking

16   that Mr. Grenon be held without bond?

17       MR. SHIPLEY:  That's correct, Your Honor.

18       THE COURT:  Why don't you address that for me and then

19   I'll hear from Mr. Grenon.

20       MR. SHIPLEY:  Sure.  Your Honor, as we've discussed,

21   the Defendant is charged, for purposes of the proceeding now in

22   this court, on Count 1 alleging various violations of 18 USC

23   371.  We are seeking pretrial detention based on risk of flight.

24   The two co-defendants who are here, two of the Defendant's

25   brothers have already been detained.  The father of the family,

1   and as I think patriarch is an apt description of him in this

2   instance, is still awaiting extradition from Colombia.

3   Apparently they've proceeded on different tracks and we don't

4   know when that will happen.

5          THE COURT:  Okay.

6          MR. SHIPLEY:  Just for your information, trial is

7   currently set for mid March.  Whether that date actually happens

8   or not will depend in part, I think, upon the extradition and

9   Judge Altonaga's wishes.

10         THE COURT:  Right, right.  That's something -- just so

11  you know, Mr. Grenon, Judge Altonaga will decide that.  She will

12  decide when your trial will be and all those details, frankly,

13  after you finish with me today, is all before Judge Altonaga,

14  the District Court Judge who is the presiding judge in your

15  case.

16         THE DEFENDANT:  Uh-huh.

17         THE COURT:  Okay.

18         MR. SHIPLEY:  And Your Honor, if the court doesn't

19  mind, I'll proceed this way, I'll proceed by proffer, a summary

20  of the facts of the case regarding this Defendant, and then I'll

21  address the risk of flight factors.  Of course the focus here is

22  not simply on risk of flight in the sense of whether he would go

23  back to Colombia or somewhere else, but whether he will actually

24  make court appearances.  That's the language of the statute.

25  And we believe that by a preponderance of the evidence no bond

1    or conditions of bond would assure his continued appearance.

2    THE COURT:  Okay.  Let me stop you a minute.  I want to

3    explain something Mr. Grenon.

4    So what's happening here, here's what the law is.  It's

5    to me almost like traffic rules.  It puts me in a lane and it

6    tells me what I have to consider, and my job is to follow the

7    law.  So if the government can show me by clear and convincing

8    evidence that there is not a bond I can set that will reasonably

9    assure the court that you will not engage in unlawful criminal

10   activity, then I have to detain you.  That's called the danger,

11   a danger analysis.

12   Secondly, if the government can show me by a lower

13   burden of proof, not clear and convincing evidence, it's a

14   higher burden of proof to detain someone for a danger of

15   committing crimes, but if the government can show me by a lower

16   burden of proof, preponderance of the evidence, which if you

17   view a scale, it's like 51% would be a preponderance, they can

18   show me by -- Mr. Shipley can show me by a preponderance of the

19   evidence that there's no bond that I can set that will

20   reasonably assure the court that you'll be showing up here every

21   time you have a court appearance, then I must detain you.

22   That's it.

23   So Mr. Shipley, you're making both arguments.  Am I

24   correct, sir?

25   MR. SHIPLEY:  Your Honor, just for this Defendant at

1    the present, simply a risk of flight, Your Honor.  We're not

2    proceeding on this Defendant, under the current circumstances,

3    on danger.

4            THE COURT:  Okay.  That's clarifying.  So the lane I'm

5    in is can Mr. Shipley show me, and I'm going to hear from you

6    because you might offer some good arguments that, you know,

7    shift the analysis for me, but we're starting with can he give

8    me a preponderance of the evidence that there's not a bond that

9    will reasonably assure the court that you will appear.  That's

10   what we're talking about.  Do you understand that?

11           THE DEFENDANT:  I understand.

12           THE COURT:  Okay.

13           MR. SHIPLEY:  And Your Honor, by way of proffer

14   regarding the offense conduct generally, from roughly April 2010

15   to July 2020, this Defendant, his two brothers, Jonathan and

16   Jordan Grenon, and his father Mark Grenon manufactured,

17   promoted, sold and distributed something called Miracle Mineral

18   Solution known as MMS.  MMS is a chemical solution containing

19   sodium chlorite and water.  When ingested orally as directed by

20   the defendants, MMS becomes chlorine dioxide, a powerful

21   bleaching agent typically used for industrial water treatment,

22   or bleaching textiles, pulp and paper.

23           The defendants claim that MMS was a miracle cure-all

24   that could treat, prevent and cure a variety of serious diseases

25   and disorders including cancer, Alzheimer's, Autism, malaria,

1   Parkinson's, multiple sclerosis, HIV/AIDS, and most recently

2   COVID-19.  However, MMS was not approved by the FDA for any of

3   those uses or for any use whatsoever.  Rather, the FDA had

4   previously issued public warnings strongly urging consumers not

5   to purchase or use MMS, advising that ingesting MMS was the same

6   as drinking bleach.

7        By targeting vulnerable populations with incurable or

8   otherwise serious diseases and disorders, the defendants sold

9   tens of thousands of bottles of MMS to consumers all across the

10  country, including to consumers in Miami-Dade County.  The

11  defendants promoted and distributed MMS through a complex

12  network of websites that they created and maintained.  These

13  websites featured countless newsletters, posts and articles

14  authored by the Defendant and his co-defendants, and dozens of

15  podcasts and video interviews featuring the defendants in which

16  they touted the miraculous healing powers of MMS.

17       The Defendant and his co-defendants were well aware

18  that their marketing activities with respect to MMS were

19  unlawful, so they decided to sell it under the guise of the

20  Genesis II Church of Health and Healing, which I'll refer to as

21  Genesis, a validly nonreligious entity that co-defendant Mark

22  Grenon created in an express attempt to avoid government

23  regulation of MMS.

24       The defendants' marketing claims with respect to MMS

25  were neither accurate nor acceptable.  For example, on March 4,

1    2020, the Defendant's father, Mark Grenon, published a

2    newsletter extolling the healing powers of MMS as a treatment

3    for COVID-19 which he titled, quote, the coronavirus is curable,

4    exclamation point.  Do you believe it?  You better, exclamation

5    point.  The newsletter provided detailed dosing instructions for

6    using MMS to treat COVID-19, including one set of MMS dosing

7    instructions for adults and another set for small children.  The

8    newsletter claimed that these dosages of MMS should wipe out

9    COVID-19.

10           Several days later, this Defendant and his father,

11   Mark, released podcasts similarly entitled the coronavirus is

12   curable, do you believe it, you better.  In these podcasts, the

13   Defendant and his father promoted MMS as a treatment for

14   COVID-19.

15           THE COURT:  The podcasts had this Defendant?

16           MR. SHIPLEY:  Correct, Your Honor.

17           THE COURT:  With his father on it?

18           MR. SHIPLEY:  Correct, Your Honor.  And in multiple

19   instances this Defendant and his father have put out podcasts

20   and other content on the internet promoting the virtues of the

21   product, and promoting the distribution of the product and that

22   primarily -- this Defendant was less involved in the manufacture

23   of the item, but very actively involved in the promotion and the

24   distribution of it.  So that Defendant was on that podcasts

25   along with his father.

1        In response to this conduct, on April 16th, the United

2   States filed a civil complaint against --

3        THE COURT:  April 16th of 2020?

4        MR. SHIPLEY:  2020.  Yes, Your Honor.  Filed a civil

5   complaint against this Defendant and his co-defendants seeking

6   an injunction to prohibit them from further violating the FDCA.

7   Judge Williams issued a TRO, and subsequently -- a temporary

8   restraining order, and then a preliminary injunction, both of

9   which prohibited the defendants from directly or indirectly

10  labeling, holding or distributing any misbranded drug, including

11  but not limited to MMS.  Notably, in issuing the preliminary

12  injunction, Judge Williams had found that the United States had

13  demonstrated a substantial likelihood that the defendants'

14  marketing of MMS violated the FDCA.

15       The defendants, this Defendant, and his co-defendants,

16  violated those court orders by continuing to label and

17  distribute MMS.  While the defendants' continued distribution of

18  MMS plainly violated the TRO and the preliminary injunction,

19  their public statements removed any doubt as to whether those

20  violations were willful.  For example, on April 21, 2020, in a

21  letter addressed to Judge Williams and attorneys for the United

22  States, co-signed by this Defendant and his co-defendants, the

23  defendants claimed that they were not bound to obey, that's

24  quote, not bound to obey the TRO.

25       In another letter addressed to Judge Williams and

1    attorneys for the United States dated that same day, Mark

2    Grenon, on behalf of all defendants, including this one, wrote,

3    quote, we are practicing civil disobedience against this unjust

4    order.  Civil disobedience is permitted in the US Constitution,

5    peaceably of course at first, if possible.  Note, the Second

6    Amendment is there in case it can't be done peaceably.  The

7    Genesis II Church of Health and Healing will not stop providing

8    MMS to the world.

9         Similarly, in several of the weekly Genesis podcasts

10   co-hosted by this Defendant and his father, the Defendant and

11   his father acknowledged quote, we're violating --

12        THE COURT:  When was this?

13        MR. SHIPLEY:  This is on or about April 2020.

14        THE COURT:  Okay.

15        MR. SHIPLEY:  This is after Judge Williams has issued

16   the temporary restraining order and the preliminary injunction.

17        THE COURT:  Okay.

18        MR. SHIPLEY:  Okay.  In these podcasts, the Defendant

19   and his father stated, quote, we're violating a temporary

20   restraining order.  Well, we don't care, we're going to do it

21   whether you like it or not, end quote.  They further threaten

22   to, quote, pick up guns, end quote, and instigate, quote, Waco,

23   end quote, should the government interfere with the defendants'

24   marketing of MMS.

25        Finally, in a podcasts dated May 10, 2020, co-hosted by

```
 1    this Defendant and his father, the defendants made the following
 2    comments with respect to Judge Williams.  Quote, you think we're
 3    afraid of some Obama-appointed judge that broke their oath?
 4    You're no judge.  This judge could go to jail.  You could be
 5    taken out, Ms. Williams.  We're not obeying, don't care what you
 6    do.  Subsequently, Judge Williams issued a permanent injunction
 7    after the defendants failed to appear and contest any further
 8    proceedings in that civil matter.
 9              So Your Honor, that concludes the government's factual
10    proffer.  I'll refer in summary fashion as well to the specific
11    evidence of this Defendant's conduct in a moment.
12              THE COURT:  Okay.  Right.  We'll go to the personal --
13    more personal information in the Pretrial Services Report.
14              Okay.  So do you have any cross-examination for the
15    witness?
16              THE DEFENDANT:  Yes.  As I was saying earlier and --
17              THE COURT:  Well, hold on.  Hold on.  Do you have an
18    agent with you?
19              MR. SHIPLEY:  I do, Your Honor.
20              THE COURT:  All right.  Come on up, Agent.  You can get
21    in the witness stand, sir.
22              Okay.  Tell me your name, sir, and your spell it for
23    me.
24              THE WITNESS:  Nathan Freeman, F-R-E-E-M-A-N.
25              THE COURT:  And you're a Special Agent with?
```

```
 1            THE WITNESS:  The Food and Drug Administration's Office
 2      of Criminal Investigations.
 3            THE COURT:  Okay.  Do you solemnly swear or affirm,
 4      sir, that the testimony you give will be the entire truth?
 5            THE WITNESS:  Yes, I do.
 6            THE COURT:  Okay.  You can have a seat.
 7            So this is called cross-examination, not argument.
 8      You've heard -- and here's the way it works.  There was a
 9      proffer of his testimony, it's the way we do this to kind of
10      expedite it.  Rather than a question and answer of the agent, if
11      you have questions for the agent about what he has testified to
12      on direct examination, you may ask questions about that.  Not
13      about other things.  The scope of a cross-examination meets the
14      scope of the direct testimony, and you've heard proffered what
15      his testimony is.
16            So do you have a question, any questions for Mr. Grenon
17      (sic) about what Mr. Shipley said he would testify to?
18                             CROSS-EXAMINATION
19      BY THE DEFENDANT:
20      Q.  Yes.  I would like to know if the FDA has ever done any
21      studies with those diseases using chlorine dioxide?
22      A.  I am not familiar with specific studies of the FDA, the
23      science community in the FDA has conducted.  I know there are
24      experts that discuss issues related to chlorine dioxide.  As has
25      been referenced earlier, there have been public statements by
```

1    the FDA equating it to drinking bleach and not being safe for

2    anyone to take under any circumstances.  But as a scientific

3    study, I can't speak to that.

4              THE COURT:  Okay.  That's your answer?

5         BY THE DEFENDANT:

6    Q.  So you do not have proof if it does work or not.

7              THE COURT:  Wait.  We're not arguing to me now.  If you

8    have a question for him, you can ask him.

9         BY THE DEFENDANT:

10   Q.  So the FDA does not have proof that chlorine dioxide does

11   work to mitigate, treat, cure, restore health to any of those

12   diseases, like the studies that we have done for the past 14

13   years.

14   A.  I can't speak to the specific studies the FDA's conducted,

15   but when the FDA issues warnings like this, it's through their

16   doctors and researchers that all have advanced degrees in

17   medicine and different scientific fields that do this type of

18   research.  But as far as the specific study you're asking me to

19   cite, I'm not able to do that.

20   Q.  It's because it doesn't exist.  They've never done it, so

21   they don't know if it works or not.

22   A.  Like I said, I'm a criminal investigator, I deal with

23   different parts of the FDA.

24              THE COURT:  The testimony was that he doesn't know

25   about studies, not that there weren't any or that there were.

1    He is not informed.  So that's your answer?

2          THE DEFENDANT:  Well, I'm letting him know because I've

3    researched it so --

4          THE COURT:  Okay.  Right now -- listen, you wanted to

5    represent yourself, you've got to play about the rules.  You can

6    question the witness.  If you have argument for me later, I will

7    hear it.  So just so we finish this part, do you have other

8    questions for agent, is it Freeman?

9          THE WITNESS:  Freeman.

10    BY THE DEFENDANT:

11   Q.  Yeah.  He said that we ingest sodium chlorite and it becomes

12   chlorine dioxide?

13   A.  Yes, and I believe there's an acidic activator as well that

14   makes it chlorine dioxide, but yes.

15   Q.  That's not what it said.  What he said was you drink it and

16   it becomes chlorine dioxide in the stomach.

17   A.  That might not be the most technical description of what

18   happens, but ultimately the products that were being sold became

19   the compound chlorine dioxide, products that you sold and

20   instructions on how to ingest them.

21   Q.  And you know the definition of bleach?

22   A.  No, I do not.

23   Q.  Okay.  It's when something is discolored.  And the word

24   "bleach" or "bleaching" does not mean it's something bad and

25   toxic.

1          THE COURT:  Remember, you're asking a question.  So

2     what's your question?

3          THE DEFENDANT:  Yeah, no.  I'm getting to it right now.

4          THE COURT:  Right now you're making a statement.

5     BY THE DEFENDANT:

6     Q.  Okay.  Because something bleaches does that mean that it is

7     toxic.

8     A.  Not necessarily by definition.  But my understanding of the

9     public warnings when they use the term "bleach" is because it's

10    commonly understood to be a cleaning product that's toxic to

11    drink.  So for the broad public to understand what the product

12    is, how it's dangerous, they use the word "bleach", which is, my

13    understanding, very equivalent to chlorine dioxide.

14         THE DEFENDANT: I don't want to make a statement.

15         THE COURT:  Right.  You can save that for later.

16    BY DEFENSE 1:

17    Q.  Do you know what bleach, industrial bleach is chemically?

18    A.  The chemical compound?

19    Q.  Yeah.

20    A.  I do not know offhand, no.

21         THE DEFENDANT:  Am I allowed to tell him what it is?

22         THE COURT:  Right now, no.  You're questioning him.

23         THE DEFENDANT:  Okay.

24         THE COURT:  Uh-huh.

25    BY THE DEFENDANT:

```
 1   Q.   Okay.  And how many people have been injured from chlorine
 2   dioxide at the doses we recommend?
 3   A.   I'm not familiar with the total number of people, but I have
 4   spoken to people personally that have been injured by taking
 5   chlorine dioxide.  I'm also aware of a lot of the information
 6   the FDA possesses relating injuries related to chlorine dioxide.
 7   Q.   Remember, I'm asking --
 8   A.   I do not know the exact number, no.
 9   Q.   I'm asking the doses.  I mean dosage-wise that we recommend
10   --
11   A.   Yes.
12   Q.   -- because people can be hurt from --
13   A.   Yes.
14   Q.   -- this dosage --
15   A.   I have spoken to people that have used the dosage that you
16   recommend and have suffered adverse consequences to that.  Yes.
17              THE COURT:  Okay.  Anything else?
18              THE DEFENDANT:  No.
19              THE COURT:  Okay.
20              THE DEFENDANT:  That's it.
21              THE COURT:  Any redirect?
22              MR. SHIPLEY:  No, Your Honor.
23              THE COURT:  Okay.  Thank you, Agent.  You can step
24   down.
25              Does the government have any other evidence or just
```

1   argument?

2          MR. SHIPLEY:  I think just argument, Your Honor.

3          THE COURT:  Okay.  Mr. Grenon, do you have any

4   evidence?  Evidence would be -- it could be your own testimony,

5   it could be a witness.  It could be a document that's evidence.

6   And once I finish the process of hearing evidence, then I hear

7   argument from both sides, how you each view the evidence and

8   what I should do about it.  Do you understand those two steps?

9          THE DEFENDANT:  Uh-huh.

10          THE COURT:  Okay.  Do you have any evidence?

11          THE DEFENDANT:  Yes, I suffered from staph infection --

12          THE COURT:  Okay.  Do you want to provide some

13   testimony now?  Is that what you want to do is testify yourself?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Raise your right hand.  Do you solemnly

16   swear or affirm that the testimony you will give will be the

17   entire truth?

18          THE DEFENDANT:  Yes, I do.

19          THE COURT:  Okay.  You can put your hand down.

20          Go ahead.

21          THE DEFENDANT:  So I suffered from staph infection

22   years ago when I was a missionary child of my father Mark, and

23   we dealt with all kinds of medical missionaries and doctors that

24   came down from the United States from hospitals like

25   universities like John Hopkins and other high, well-known

1   hospitals and universities.  And I took all the antibiotics.

2   Staph infection is a methacillin-resistant and

3   antibiotic-resistant staph infection.  And so I took all the

4   kinds of antibiotics possible.  All of my brothers and sisters

5   suffer from this because we work in the hospital, it's an

6   airborne bacteria, and so we all suffered from this except for

7   my mother.

8        And so like I said, we used antibiotics.  The doctors

9   wanted to cut my thumb off because it was really infected.  They

10  wanted to cut my brother's leg off because he was really

11  infected also.  And after using chlorine dioxide, we detoxed the

12  body and our infections went away after two to three months.

13  And that was about, get this right, it was about 17 years ago

14  this happened.  Okay.

15       And another thing I wanted to testify about is

16  especially with the COVID.  We have proof that there are 5,000

17  plus doctors in Latin America that are using chlorine dioxide,

18  and they are treating and curing at a 99.6% success rate of

19  COVID, and a 96.9% or 96,5% -- what's the word in English.  I

20  speak Spanish and English so I'm trying to remember -- to

21  prevent, to prevent COVID.  Also in Bolivia, there is a whole

22  state in Bolivia that has approved chlorine dioxide for the

23  treatment and prevention of COVID, and they have excellent

24  results there.

25       So not just that, there's many other diseases that I

```
 1    can testify that I have personally helped people with in
 2    Colombia.  Diabetes.  I've helped also my little niece who
 3    suffered from seizures.  She no longer suffers from seizures.
 4    That was seven years ago.
 5         I've been around the world teaching doctors and
 6    scientists how to use this and how to treat people, and all of
 7    them have testimonies, and all of them have proof.  And we had
 8    -- we had about 3 million views on our testimonies on You Tube
 9    before that was wiped out about six years ago, because You Tube
10    is a very, very -- what's the word.  Anything that goes against
11    policy of theirs, they wipe it out when we have the proof.  And
12    we also have, I think it was about eight or 900 sworn and signed
13    affidavits that we got together last year that obviously I don't
14    have with me because I've been captured for a year and a half,
15    but those are sworn and signed affidavits from people who have
16    used this and who have been restored to their health.
17              THE COURT:  Let me do this.
18              THE DEFENDANT:  Yes.  Go ahead.
19              THE COURT:  Let me reflect back to you what I think I'm
20    hearing you say.  That you have a variety of reasons why you
21    believe that your product --
22              THE DEFENDANT:  Sacrament, ma'am.  Sorry.
23              THE COURT:  Pardon?
24              THE DEFENDANT:  Sacrament.  It's a church sacrament.
25              THE COURT:  Okay.  That's how you characterize it, but
```

```
1    it is a chemical, chlorine dioxide, correct?  It's a series of
2    chemicals, and you have your reasons and you listed some of them
3    why you believe that it is, in fact, helpful and beneficial, and
4    you disagree with the FDA's view that it is not.  Is that a fair
5    summary?
6              THE DEFENDANT:  Yes.
7              THE COURT:  I'm trying to just encapsulate what you're
8    saying and let you know that I've heard you.
9              THE DEFENDANT:  Uh-huh.
10             THE COURT:  Okay.  Okay.  Is there any other evidence?
11             THE DEFENDANT:  Well evidence, like I said, I don't
12   have.  I'm just telling you what I --
13             THE COURT:  Okay.  Then we're going to move on to
14   argument next.
15             THE DEFENDANT:  Yeah.
16             THE COURT:  So Mr. Shipley, tell me your argument, sir.
17             MR. SHIPLEY:  Sure.  Your Honor, again, the question is
18   whether there are any conditions or combination of conditions
19   that will ensure the Defendant's appearance at future court
20   proceedings.  They do not exist in this case.  They did not
21   exist for the other co-defendants who have been made appearances
22   in this case already.  They do not exist for this Defendant even
23   less so.
24             First of all Your Honor, it is an indicted case.
25   There's no question of probable cause.  The evidence against
```

1    this Defendant is overwhelming.  His role, as I indicated

2    earlier, was primarily to promote MMS.  He did so via podcasts,

3    web postings and other communications.  In fact, the pamphlet

4    that was distributed with the product both pre and post-COVID

5    identified his e-mail as the contact for quote, unquote,

6    sacramental guidance.

7           In addition, as I mentioned earlier, he's on the

8    podcasts with his father from March 8, 2020 promoting MMS as a

9    cure for the coronavirus, and was on a similar podcasts on March

10   15, 2020.  Both of those are specific overt acts in the

11   indictment.

12          I would note as well in March 2020, the month when the

13   Grenons began promoting MMS as a cure for the coronavirus, they

14   received approximately $123,000 in monthly MMS-related sales

15   revenue, a nearly 4,100 percent increase in sales.  This is

16   snake oil.

17          The Defendant has spent the last year and a half trying

18   to avoid this court's jurisdiction.  He did not come here

19   willingly.  He fought his extradition, as is his right to do so,

20   but this is a Defendant who, despite being a US citizen, had no

21   desire to participate in these proceedings in this courtroom.

22          most fundamentally, the Defendant has no ties

23   whatsoever to the Southern District of Florida.  He has

24   extensive ties to Columbia where he was residing with his family

25   when these charges were filed.  He hasn't resided in the United

States since 2012, and at least according to information in the

Pretrial Services Report, as far back as 1994.  His family is in

Colombia, his wife and his children.  He has no ties to this

district.  The family itself has ties to the Middle District of

Florida, but even those were not enough to support the release

of the two co-defendants here.  There are no ties to the

Southern District of Florida.

There is no employment for this Defendant other than as

a self-annointed bishop of the Genesis II Church.  So that, as

well, is lack of any ties to this district.

In addition Your Honor, the Defendant is facing a

serious prison sentence.  Even if the Defendant were to plead

guilty, which is not something that seems he's interested in

doing at this point certainly, his guideline range would still

be well above the five year statutory maximum.  So he's looking

at a full five years.  So even though we do not have the

contempt charges, which have no statutory maximum and have the

potential for even greater punishment, under a guidelines

analysis of at least 168 to 210 months, he would be at the five

years.

In addition to that, Your Honor, and really going

fundamentally to what any bond condition would be about, this

Defendant has a history of proudly violating court orders.  He

and his co-defendants have repeatedly stated they do not believe

this court has any authority over them.  They willfully ignored

1    the TRO and the preliminary injunction issued by Judge Williams,

2    and indeed sent communications not merely expressing their

3    defiance, but actually threatening Judge Williams.  That

4    certainly shows that this Defendant poses a substantial risk of

5    nonappearance at any future proceeding.  There's no reason to

6    believe that he believes that this court has any authority to

7    compel him to do anything.  And again, I'm referring

8    specifically the letter dated April 21, 2020 that was signed by

9    Mark on behalf of all the defendants, and as well signed by this

10    Defendant on the same date.

11         In addition to that, there's the May 10, 2020 podcasts

12    hosted by this Defendant, along with his father, where he made

13    the references to the judge going to jail, Judge Williams being

14    taken out, and the statement we're not obeying it, referring to

15    what was then the preliminary injunction.  And, of course, the

16    Defendant did not appear -- none of the defendants appeared for

17    any of the proceedings in that civil enforcement matter that was

18    brought that yielded the TRO and the preliminary injunction.

19         So Your Honor, for all of those reasons, there is no

20    condition or combination of conditions that would ensure this

21    Defendant's appearance at future court proceedings in this

22    district.

23         THE COURT:  Okay.  So Mr. Grenon, the question is this

24    simply, not why, what bond can I set that will cause me to

25    reasonably expect that you'll be showing up to court given all

1    of that?

2            THE DEFENDANT:  Well, first of all, I would like to say

3    that I did not fight my extradition coming here to Colombia.

4    Coming from Colombia to here, to the United States.  That was

5    not fought.  That was a public defender that was assigned to me

6    that asked for proof in the process to delay it, and I had

7    nothing to do with that.  I didn't even give him, in Colombia,

8    permission to ask for proof of, for which they asked for proof

9    or studies if I have any problems in Colombia, and that slows it

10   down three to four months more.

11           THE COURT:  Well, let me say this Mr. Grenon, I've

12   encountered many defendants who have been extradited from

13   Colombia with counsel who have chosen to waive extradition.

14   That's plainly available to you, that was available to you.

15           THE DEFENDANT:  Oh, I know, I know.

16           THE COURT:  You could have waived extradition, but it

17   sound s like you chose not to waive extradition, right?  You

18   allowed your lawyer to resist it, which was certainly within

19   your right, and had to get the court to order your extradition.

20           THE DEFENDANT:  Well, I had to lawyer.  That's the

21   thing.  I did not give power of attorney to a lawyer.  They

22   assigned me one, and I never even met the guy.  Okay.  So --

23           THE COURT:  All right.

24           THE DEFENDANT:  I know that's a Colombian process.

25           THE COURT:  So you're telling me you would have been

1   happy to come here to face these charges?

2           THE DEFENDANT:  Well, if the extradition process is

3   flowed until, yeah, I cannot fight it, it's going to happen, I'm

4   going to come here and I would have come here.  I would have

5   been here months earlier.  Again, so I was not fighting my

6   extradition.

7           About what he said about taking out Kathleen Williams,

8   that was taking her out of power, out of her seat.  Because of

9   Title 18 242 says that if anybody under deprivation under color

10  of law, if you violate my rights, which we believe that our

11  First Amendment rights are being violated, then you can lose

12  your job, you can go to jail and you can pay a fine, no matter

13  who you are.  A judge, a lawyer, a police officer, anybody under

14  color of law.  That's what we were quoting.  We were not quoting

15  -- I'm not going to say it, but what he's referring to.  And so

16  what else --

17          THE COURT:  Okay.  Go ahead.

18          THE DEFENDANT:  I would -- like my brother said also, I

19  would gladly take this to trial and be here, and to prove my

20  point that we have the right to do this, that we are not wrong,

21  that we have the evidence.  And so we're all looking forward to

22  going and taking this to trial so that we can prove our point.

23  So it's -- we are -- I am going to be there, that's for sure.

24  I'm not -- I am not a flight risk.  I've always lived out of the

25  United States because my father was a missionary.  I do -- I did

1  come back to the United States probably once a year, once every

2  two years to visit my mother who lives in Bradenton, Florida.

3       THE COURT:  Am I correct that you moved away in 1994?

4       THE DEFENDANT:  In '94, my father moved us to the

5  Dominican Republic.

6       THE COURT:  And your residence has been outside of the

7  United States since then; is that correct?

8       THE DEFENDANT:  Up until 2012, 2013, then I was here

9  for a year or so.

10      THE COURT:  Okay.

11      THE DEFENDANT:  And then I moved to Colombia.

12      THE COURT:  Okay.

13      THE DEFENDANT:  And so I don't know why he's saying

14  that if I don't have any ties to Southern California or --

15      THE COURT:  This district.

16      THE DEFENDANT:  This district, Southern Florida.  Then

17  I have no reason to believe that I would come here.  Obviously

18  if somebody captured you and you live in Northern Florida and

19  you had a problem down here in Southern Florida, obviously you

20  don't have any ties here in this area, correct?  So I am not --

21  obviously I don't live -- I don't have any ties here in Southern

22  Florida so I'm -- you know, I would have to be with my mother in

23  the Middle District of Florida.

24      THE COURT:  Uh-huh.

25      THE DEFENDANT:  And --

```
1          THE COURT:  Are you proposing that you would live with
2     your mom in the Middle District of Florida?
3          THE DEFENDANT:  Yes, I would live with my mother and
4     prepare my defense until trial was set.  Well, if it's going to
5     be changed, it is set for March, and I am willing to take this
6     to trial and to fight this.  And I would ask you, if it's
7     possible, to have bond so that I can prepare my defense
8     adequately.  And like he said, I'm not -- I'm not being charged
9     with the contempt because that's not an extraditable crime from
10    Columbia.  So I personally have not dealt with any distributing
11    of our church sacrament.
12          And another thing that he said is incorrect is we did
13    not sell.  We take donations.  So the church donations did go
14    up, like he said, 400%.  And those all go to projects and to
15    help people because this is a nonprofit church.
16          THE COURT:  Uh-huh.
17          THE DEFENDANT:  So we're just -- all we're doing is
18    trying to help people around the world.  And what else can I
19    say?  I mean, if I did harm somebody, I am sorry.  But I know
20    there was no intent whatsoever, and all we wanted to do -- all
21    we wanted to do is help people, and that's all I've done my
22    whole life as a missionary child.  And when you find something
23    that works, and God's telling you to go out there and use it and
24    help people then, you know, I can't stop.  If an agency -- I
25    mean, that's why we were fighting it.  But if an agency tells
```

1    you, you know, it's not approved, it's a church sacrament.  I

2    don't think a church needs approval for its belief.

3          THE COURT:  Okay.  So having heard both the evidence

4    and the argument of both the government and you, Mr. Grenon, I

5    find that the government has clearly, without doubt, shown me by

6    a preponderance of the evidence that there is not a bond I can

7    set that will reasonably assure the court that you will appear

8    as required, and I'm therefore ordering you to be held without

9    bond until your trial.

10          Mr. Shipley, I'm going to ask you to draft for me today

11    a proposed detention order using the AO's form in Word version

12    so that I can modify it.  And as you know, I need to make

13    findings of fact, and I want to note here certainly findings of

14    fact that I make.

15          So Mr. Grenon, a bond is a court order.  That's all it

16    is.  It's a court order that if you, you know, agree to pay a

17    certain amount of money, if you violate the bond, that then you

18    can be released, for example.  And I hear you to be saying,

19    although you don't -- I'm not informed enough to ask for it,

20    that you're suggesting that I release you on a personal surety

21    bond, that is that you don't put up any money today, that you

22    sign the bond paperwork and that whatever the amount of that

23    bond would be you agree that if you violate the bond, you then

24    owe the government that amount.  You could walk out the door

25    with a personal surety bond.  I issue those all the time.  And

1    there's conditions placed on a bond and that is that you --

2    there are standard conditions such as don't violate the law,

3    don't use drugs, things of that nature; also report to your

4    Pretrial Services officer and then there's special conditions

5    that I would set.  And it's a court order.  And there's nothing

6    clearer in all of this than your own words, along with your

7    father of defying orders of this court.  Judge Williams' orders.

8    She ordered you to not promote, sell, distribute, et cetera this

9    product that you have, MMS.  It's the short name we're giving

10   it.  And you have made public statements that you defied the

11   order, that you don't recognize the authority of this court,

12   that you don't think you have to follow the order, and that

13   basically you're doing whatever you please.

14           No, it's now my turn for you to listen to me.  I

15   listened to you.  Because I want you to understand why I'm

16   detaining you.  You have a right to know it.  So I'm looking to

17   see do I have somebody in front of me who I think will obey the

18   order of a court, which is what a bond is, and your own behavior

19   speaks very compellingly to me that I can't trust you to do

20   that.  Your statements about you could be taken out, Ms.

21   Williams, I view those as a threat and you should understand

22   that.  You should understand that somebody in my shoes, when I

23   hear that, that a party who I've ordered to do something refuses

24   to obey it and says I could be taken out, I would consider that

25   a threat.  You've got to be smart enough to get that.

1          THE DEFENDANT:  It's taken out of context.

2          THE COURT:  You need to understand it, I view that as a

3    threat.  And your behavior shows that you have been contemptuous

4    of this court's orders.  So there's really no amount of money

5    that I can have you agree to put up to the court that would make

6    me think that you're going to follow the conditions of the bond,

7    which most importantly means showing up to court.  So that's one

8    reason for my ruling.

9          Another reason is, and this is not necessarily an order

10   of priority here, but you've heard that under the sentencing

11   guidelines, Mr. Shipley has looked at them, if you are

12   convicted, the guideline range he believes will come out to be

13   -- the bottom of the range for imprisonment will be greater than

14   five years.  What that would mean is if he's correct, and this

15   is not the day to figure it out, when it comes to your

16   sentencing, Judge Altonaga will have -- presumptively have to

17   sentence you to the maximum term of incarceration, five years in

18   prison.  Now you know that.  He said it to you before.  Now,

19   that's a powerful incentive for certain people to leave this

20   jurisdiction and avoid being incarcerated.  That is an

21   intelligent person such as you should be listening to that and

22   understanding that that is looking like a very real possibility.

23   So there is an incentive to flee.  What's keeping you here?  Not

24   a whole lot.  You have basically lived outside the United States

25   for, I think, it's about 27 or 28 years with the exception of

```
 1    2012 and 2013.  Your wife and three children are in Colombia and
 2    you've lived there for quite a few years.  That's your home.
 3    I'm sure you want to go home.  Your employment is working in
 4    this Genesis, as you call it, church.  Frankly, given all that's
 5    happening here, it's a lot easier for you to make some money
 6    doing that there than it is here.  So I'm looking to see if the
 7    defendant in front of me maybe could get a stable job here, I
 8    could let that person out on bond so that they could pay rent.
 9    They could find a place to live here.  They would have a reason
10    to hold themselves here, and you're not presenting that.
11            So let me see what the other things that I had here,
12    because I want you to know my basis for detaining you.  I think
13    those are -- those right there are certainly proof beyond a
14    preponderance of the evidence, well beyond it.  The scale hasn't
15    just been tipped 51%, there's quite a bit of evidence, more than
16    a preponderance of the evidence that there's not a bond I can
17    set that will reasonably assure me of your appearance.  So I'm
18    explaining this because I want you to understand it, it's your
19    right to understand it, I think the law requires me to order you
20    to be held in custody and I'm going to do that.
21            So that is it.  We have covered everything here.
22    You're finished with being in front of a magistrate judge.  Your
23    next appearance will be before Judge Altonaga and she will
24    address how your trial moves forward.
25            Okay.  Thank you everyone.  We're adjourned.
```

1          COURTROOM DEPUTY:  All rise.

2          THE COURT:  Mr. Shipley, if you can send that to me

3     today, it will be very helpful.

4          MR. SHIPLEY:  I'll go back and do it now, Judge.

5          THE COURT:  Thank you so much.

6          (PROCEEDINGS CONCLUDED)

7                              *  *  *  *  *

8                     **C E R T I F I C A T E**
      I certify that the foregoing is a correct transcript from the
9     digital audio recording of proceedings in the above-entitled
      matter.

10

11    2/20/2022_____      /s/ Dawn M. Savino, R.P.R., C.R.R.
      Date                       DAWN M. SAVINO, R.P.R., C.R.R.
12

13                          **I N D E X**

14                          **WITNESSES**

15    ALL WITNESSES:                                    PAGE:

16    For Government:

17      Nathan Freeman:
        Cross-Examination by Defendant Grenon          35:18
18                          **EXHIBITS**

19    None

20

21

22

23

24

25